## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LISA BUTLER, Derivatively On Behalf of IAC/INTERACTIVE CORPORATION, | ) Case No. 04 CV 09067 (LAP) )  ) VERIFIED SHAREHOLDER DERIVATIVE |
| Plaintiff, | ) COMPLAINT FOR BREACH OF FIDUCIARY ) DUTY, ABUSE OF CONTROL, GROSS |
| vs. | ) MISMANAGEMENT, WASTE OF ) CORPORATE ASSETS, UNJUST |
| BARRY DILLER, VICTOR A. KAUFMAN, DARA KHOSROWSHAHI, JULIUS GENACHOWSKI, RICHARD N. BARTON, EDGAR BRONFMAN, DONALD R. KEOUGH, MARIE-JOSEE KRAVIS, H. NORMAN SCHWARZKOPF, ALAN SPOON, DIANE VON FURSTENBERG, STEVEN RATTNER, ANNE M. BUSQUET, ROBERT R. BENNETT, JOHN C. MALONE, JEAN-RENEE FOURTOU, | ) ENRICHMENT AND VIOLATIONS OF THE ) SECURITIES EXCHANGE ACT OF 1934 )  )  )  )  )  ) ECF Case )  )  ) |
| Defendants, | )  )  ) |
| - and - | )  ) |
| IAC/INTERACTIVECORP, a Delaware corporation, | )  )  )  ) |
| Nominal Defendant. | )  )  ) |
| | ) DEMAND FOR JURY TRIAL |

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of IAC/InterActiveCorp, (also known during the relevant period as "InterActive Corporation" and "USA InterActive Corporation") ("IAC" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between March 2003 and the present (the "Relevant Period") and that have caused substantial losses to IAC and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

3.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by this court permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to IAC occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.     Rather than selling its own products or services, IAC largely acts as intermediary between suppliers and consumers, aggregating large blocks of consumer goods and services (primarily travel-related products such as hotel rooms and airline tickets) from suppliers and selling them to consumers over the Internet.  IAC currently has eight operating segments, including Travel (Expedia, Hotels.com, Hotwire, Interval International, and TV Travel Shop), Electronic Retailing (HSN, a home shopping service), Ticketing (Ticketmaster and ReserveAmerica), Personals (Match.com), Financial Services and Real Estate (LendingTree.com), Teleservices (Precision Response Corporation), Local and Media Services (Citysearch, Evite, Entertainment Publications, Inc. and TripAdvisor, Inc.) and InterActive Development (ZeroDegrees).  But its Travel segment provides the lion's share of its income, such that during the first six months of 2004, approximately

70% of the Company's net income was derived from its Travel segment.  In FY:03, IAC sold over $10 billion in travel services, making IAC the fifth largest travel company in the world.

6.     The Travel segment's business model was built on the ability of the Company's majority-owned subsidiaries, Expedia, Inc. and Hotels.com, to contract with the major hotel chains for non-exclusive rights to sell hotel room bookings for the major hotel chains in exchange for a fee. Hotel.com's customers would pay Hotels.com for a hotel room on its Web site, and then Hotels.com would pay the pre-negotiated price to the hotel chain for the room, withholding its fee in the form of a commission for handling the booking.  Conversely, Expedia would buy rooms at a wholesale price and mark them up for sale at retail prices, retaining the difference as its fee.

7.     Online travel companies B such as Hotels.com and Expedia.com B became popular because online shoppers could compare prices at various hotels on one Web site and could conduct secure Internet credit card transactions at those Web sites.  Hotels.com grabbed a large share of the discount online travel booking business by advertising that it would use its volume buying power to get volume discounts that in turn would be passed on to its online customers.

8.     IAC grew through acquisitions.  The Company purchased a controlling interest in Ticketmaster in July 1997.  On May 10, 1999, the Company acquired substantially all of the assets of the two entities which operated Hotels.com's Web sites from their founders.  In February 2000, IAC sold 6.2 million shares of its then wholly-owned subsidiary, Hotels.com, in an initial public offering, leaving it the majority shareholder.  On February 4, 2002, the Company acquired a controlling interest in Expedia.

9.     On June 3, 2002, the defendants caused the Company to announce the repurchase of minority interests in three of the Company's publicly traded subsidiaries, Expedia, Hotels.com and Ticketmaster, through the issuance of IAC common shares.  However, Expedia's CEO and Chairman, Richard N. Barton, and Hotels.com's founders, David Litman ("Litman") and Robert Deiner ("Deiner"), opposed the buyout and sought a bigger premium from IAC for their interests. The market reacted negatively, complaining it could not value the combined entity, and IAC's stock price declined.  On October 10, 2002, Barry Diller ("Diller") reported that IAC had completed the stock-for-stock acquisition of the minority interest in Ticketmaster, but that it was stopping its

attempts to repurchase the minority interests in Hotels.com and Expedia "for business reasons." At the October 10, 2002 press conference announcing the completion of the Ticketmaster acquisition, Diller stated emphatically that IAC would not be reacquiring the minority interests in Expedia and Hotels.com:

> Q8. (Safra Rafge (phonetic), Piper Jaffrey) The decision not to pursue acquisition of Expedia and Hotels.com--How is this position new from what you had before, as you are saying there is an eventuality they will come inside? Travel is an extremely hot growth space and a core focus, so why not pay the premium and bring them in as well?
>
> A. (Barry Diller) We really have stopped the process. There were no grounds for making a transaction with either of them, and there are no current grounds for doing so. There is a range of other things that could come up, but we've stopped the process. It was enervating and confusing the markets at a time. We were sick of the drag of this as an unfinished question. What else we've learned is that Hotels.com and the hotel portion of Expedia directly compete with one another. But this competition is extremely healthy and that helped tell us to leave this alone right now. We became convinced we could knit together what needs to be knitted together. This process was stopping us from doing this. Things will now be clearer to us, to the marketplace and those involved in the operations of these companies. I'd like it more if we had one currency and we're completely consolidated. But it is not going to happen right now. We're properly energized now for going forward.

10.     However, Diller kept his sights aimed on building IAC into the single, integrated Internet travel giant it now is. Beginning in early 2003, as discussions between Diller's IAC and Barton's Expedia and Diener's and Litman's Hotels.com advanced, defendants began to artificially inflate the price of the Company's common stock in order to decrease the amount of stock IAC would ultimately have to issue to acquire all of the outstanding shares of Expedia and Hotels.com that it did not already own. This in turn would permit IAC to use inflated IAC stock as acquisition currency to repurchase all of the publicly traded shares of Expedia and Hotels.com under terms that would not further dilute defendants' own interests in IAC. Throughout the Relevant Period, defendants also caused IAC to spend over $1.5 billion to repurchase over 47 million shares of its own common stock on the open market to further prop-up the Company's stock price.

11.     At the start of the Relevant Period on March 19, 2003, IAC owned approximately 54% of the outstanding shares of Expedia stock but controlled approximately 94.9% of the combined voting power of Expedia. On March 19, 2003, the Company announced that it would acquire the rest of the shares of Expedia that it did not already own by issuing approximately 92.5 million basic

shares of IAC common stock (124.9 million shares on a fully diluted, treasury-method basis), then valued at just over $2 billion, and exchanging each of the minority-held shares of Expedia for approximately 1.94 shares of IAC stock. The market responded positively to defendants' statements about the deal synergies and the Company's plans to be the online travel leader, and by the time the acquisition was consummated on August 11, 2003, the Company's stock price had increased 32% and the stock that was issued to Expedia's shareholders had a market value of almost $3 billion. Barton, Expedia's founder and CEO, had announced his resignation on February 5, 2003, and subsequently sold 1,256,350 shares of IAC common stock, over 60% of which had been received in connection with his termination and the acquisition of Expedia by IAC, during the Relevant Period for over $40 million in proceeds.

12.     IAC also owned approximately 68% of the outstanding stock of Hotels.com but controlled 97% of its voting rights. On April 10, 2003, the Company announced it would acquire the 32% minority interest in Hotels.com it did not already own, issuing approximately 43 million basic shares of IAC common stock (45.2 million shares on a fully diluted, treasury-method basis), then valued at approximately $1.163 billion, and exchanging each minority share of Hotels.com stock for 2.4 shares of IAC stock. As a result of defendants' positive statements concerning the deal synergies and improvements to the Company's business model, the Company's stock price had increased by 30% and when the deal was finally consummated on June 23, 2003, and the stock the Company issued had a market value of approximately $1.640 billion. Hotels.com founders Diener and Litman retained their control of Hotels.com, which was to be run as a separate division within IAC.

13.     On May 5, 2003, the defendants caused the Company to announce that it would acquire all of the outstanding shares of LendingTree Inc., causing the company to issue approximately 18.3 million basic shares of IAC stock (21 million total shares on a fully diluted, treasury-method basis) and exchanging each share of LendingTree stock for approximately 0.62 shares of IAC stock, in a deal then valued at approximately $534 million based on the trading price of IAC stock on May 5th. That transaction was completed on August 11, 2003, and with the run-up in the Company's stock price in the interim, the Company ultimately issued stock with an

approximate market value of $657 million to LendingTree's shareholders.

14.     Defendants' statements made in connection with the announcement of these acquisitions and with the Company's financial reports and other statements made throughout the Relevant Period were materially false and misleading because they did not disclose that:

(a)     Certain of the Company's online customers were being double-billed for hotel rooms purchased on the Company's Web sites because the Company was not timely and/or accurately reporting hotel room sales to the chain hotels and as a result, certain customers were again being charged the room rates that the Company had already collected, leading to great customer dissatisfaction;

(b)     Certain hotel chains were contesting the Company's slow payment for hotel room sales made on its Web site and were threatening to make less hotel rooms available to the Company and/or to stop doing business with the Company altogether;

(c)     Certain of the Company's Web site customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount, the Company was charging a premium for rooms, leading to further customer dissatisfaction and causing customers to choose other online reservation providers or to buy directly from the hotel Web sites;

(d)     Certain IAC hotel customers were dissatisfied with the Company's practice of displaying a message on its Web sites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out, which had the effect of diverting potential sales to other hotels, causing certain hotel customers to threaten to stop doing business with the Company altogether;

(e)     The Company had previously been selling a large number of hotel rooms and airline seats through more than 24,000 affiliate Web sites, such as Web sites operated by the travel industry in certain cities, but since October 2002, many of these Web sites were either privately threatening and/or actually pursuing litigation against the Company, alleging among other things copyright infringement and predatory advertising, claiming that Hotels.com was using special software to deprive these affiliate Web sites of the portion of its fee that it had promised to pay them and that as a result, certain of the affiliate Web sites had refuted their otherwise exclusive, multi-year

contracts with the Company and certain of these affiliate Web sites were instead transacting their purchases of hotel rooms directly with the hotel chains;

(f)     One substantial business partner of Hotels.com, Metroguide, had commenced a lawsuit against Hotels.com and Diener alleging violations of federal copyright law and unfair business practices in January 2003 in the Southern District of Florida.  Defendants did not disclose the pendency of this litigation or the rift with what Diener had described in October 2002 as one of Hotels.com's "larger affiliates, proving [Hotels.com] a great deal of traffic";

(g)     The defendants were causing the Company to under-report its state and local sales tax expenses for some locations because defendants were causing the Company to pay state and local occupancy taxes based on the wholesale rate at which the Company rented blocks of rooms from hotel operators, rather than the higher retail rates charged customers; and

(h)     Certain hotels and airlines were decreasing the Company's allotment of rooms and seats because of defendant's bad business practices.

15.     Suddenly, on August 4, 2004, the defendants caused the Company to issue its second quarter 2004 earnings release disclosing that its Q2:04 net income fell 24% from the same quarter in 2003 and that it was cutting its forecast for full-year operating profits, admitting that it was being provided less airline seats and hotel rooms to sell.  Defendants blamed the decrease in revenue on a change in accounting whereby the Company would start recognizing online hotel room sales revenues only on the fees it earned (whether through commissions or mark-ups), rather than recognizing the entire price customers paid IAC for the rooms.  The Company's net income dropped 24% to $73.2 million from $96.2 million per share in Q2:03, based in large part on a 35% increase in advertising expenses.  The Company lowered its operating income expectations for 2004 to $430 million from the "$415 to $615 million" range it had estimated in May 2004, while the acquisitions of the minority interests in Expedia, Hotels.com and LendingTree were still pending.  Defendants also disclosed that for the first quarter in its history as a publicly traded company, IAC's travel bookings had actually decreased in Q2:04.

16.     On this news the Company's stock plummeted on extremely high volume of almost 90 million shares, more than 18 times the average daily trading volume for this stock.  The

Company's stock price precipitously dropped from its Relevant Period high of $42.74 per share on July 7, 2003 to close at $22.80 per share on August 4, 2004, erasing over $10 billion in market capitalization.  Deusche Bank and other analysts cut the Company's stock ratings.

17.       In an August 5, 2004 email sent to IAC employees, Diller conceded he had overstated the Company's then-existing business operations and status in earlier statements and gave too-bullish guidance at an investor and analyst conference in November 2003, which he admitted misled investors:

> From: Barry Diller
>
> Sent: Thursday, August 05, 2004 7:34 PM
>
> To: All IAC
>
> Subject: IAC
>
> I think it's appropriate to review the last days....
>
> We released our earnings with an attendant conference call with analysts and our stock is down severely as a result...that you all surely know. We said on the call that it was a good quarter, and it was. What wasn't good is that we, your management, raised expectations too high at our Investor Day last November and are now paying the price. Added to that, and I do believe inappropriately, I was far too defensive in replying to analysts' questions, showing my exasperation from pointed queries about the fundamentals of our businesses, particularly Travel. I could say the factors for my lame performance were that the call went on too long, that I felt it necessary with so much querulous pounding to strongly assert the health and prospects I so clearly believe in, and that I felt an overreaction brewing that required the most vigorous defense. All of these are true but the higher truth is we did disappoint the estimates for growth set by our own hands and by not lowering them earlier in the year as the strain became clear we mightily exacerbated the problem. That, and the extremely jittery markets of the last months did the rest, with the result that our shareholders and analysts were caught in the breech...so the responsibility for this, allowing the bar to be set unreasonably high, and then not having the proper patient focus on our conference call, is fully mine.

18.       On August 16, 2004, Sabre Holdings, the Southlake, Texas-based owner of Travelocity.com, a major competitor of Expedia.com and Hotels.com, posted a ten-fold increase in its own Q2:04 net income compared to its Q2:03 quarter, causing its stock price to increase. Compared to IAC's common stock price, which declined by 32% between January 1, 2004 and August 16, 2004 alone, Sabre's stock had increased 9.8 % during that same period.

19.       Then, on August 16, 2004, InterContinental Hotels Group Plc ("InterContinental"), the world's largest hotel operator by rooms, announced it ended its agreement to promote its hotels

through Expedia.com and Hotels.com because the online travel sites owned by IAC did not meet its standards. InterContinental, whose chains include Holiday Inn and Crown Plaza among others, stated that Travelocity would be the only authorized online promoter of its hotel rooms because Travelocity's sales practices met its standards. InterContinental disclosed that the conflict between it and IAC, Expedia.com and Hotels.com had been waging since at least April 2004 when InterContinental stated it would no longer work with a Web site that did not show customers the commissions they were being charged and fax bookings made directly to hotels, rather than reporting them through an automation system. InterContinental also objected to Expedia.com's and Hotels.com's Web sites indicating InterContinental's rooms were sold out merely because the Web sites had exhausted their allocation of discount rooms.

## THE PARTIES

20.     Plaintiff Lisa Butler is, and was at times relevant hereto, an owner and holder of IAC common stock. Plaintiff Butler is a citizen of Pennsylvania.

21.     Nominal defendant IAC is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 152 West 57th Street, New York, New York. IAC acts as an intermediary between suppliers and consumers, aggregating large blocks of consumer goods and services from suppliers and selling them to consumers over the internet.

22.     Defendant Diller is, and at all times relevant hereto was, Chairman, Chief Executive Officer ("CEO") and a director of IAC. Because of Diller's positions, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' ("Board") meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Diller participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:03, IAC paid defendant Diller $5,163,232 in salary, bonus and other compensation. During the Relevant Period, Diller sold 775,000 shares of IAC stock for proceeds of $28,675,000. Defendant Diller is a citizen of

Connecticut.

23.     Defendant Victor A. Kaufman ("Kaufman") is, and at all times relevant hereto was, Vice Chairman and a director of IAC.  Because of Kaufman's positions, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof via reports and other information provided to him in connection therewith. During the Relevant Period, Kaufman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, IAC paid defendant Kaufman $3,656,000 in salary, bonus and other compensation, and granted him restricted stock awards worth approximately $2,777,913.  Defendant Kaufman is a citizen of New York.

24.     Defendant Dara Khosrowshahi ("Khosrowshahi") is, and at all times relevant hereto was, Executive President and Chief Financial Officer ("CFO") of IAC.  Because of Khosrowshahi's positions, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Khosrowshahi participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:03, IAC paid defendant Khosrowshahi $2,681,000, in salary, bonus and other compensation, and granted him restricted stock awards worth approximately $2,449,621.  During the Relevant Period,  Khosrowshahi sold 50,000 shares of IAC stock for proceeds of $1,866,275. Defendant Khosrowshahi is a citizen of New York.

25.     Defendant Julius Genachowski ("Genachowski") is, and at all times relevant hereto was, Executive Vice President and Chief of Business Operations of IAC.  Because of Genachowski's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Genachowski participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:03, IAC paid defendant Genachowski $2,014,025 in salary, bonus and other compensation, and granted him restricted stock options worth approximately $1,767,749.  During the Relevant Period, Genachowski sold 81,666 shares of IAC stock for proceeds of $2,998,975.  Defendant Genachowski is a citizen of the District of Columbia.

26.    Defendant Richard N. Barton ("Barton") is, and at all times relevant hereto was, a director of IAC.  Because of Barton's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.   During the Relevant Period, Barton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Barton sold 40,000 shares of IAC stock for proceeds of $1,427,800.  Defendant Barton is a citizen of Washington.

27.    Defendant Edgar Bronfman ("Bronfman") is, and at all times relevant hereto was, a director of IAC.  Because of Bronfman's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bronfman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Bronfman is a citizen of New York.

28.    Defendant Donald R. Keough ("Keough") is, and at all times relevant hereto was, a

director of IAC.  Because of Keough's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Keough participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Keough is a citizen of Georgia.

29.    Defendant Marie-Josee Kravis ("Kravis") is, and at all times relevant hereto was, a director of IAC.  Because of Kravis's position, she knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Kravis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Kravis is a citizen of New York.

30.    Defendant H. Norman Schwarzkopf ("Schwarzkopf") is, and at all times relevant hereto was, a director of IAC.  Because of Schwarzkopf's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Schwarzkopf participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Schwarzkopf is a citizen of Florida.

31.    Defendant Alan Spoon ("Spoon") is, and at all times relevant hereto was, a director of IAC.  Because of  Spoon's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers

and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.   During the Relevant Period, Spoon participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.   Defendant Spoon is a citizen of Massachusetts.

32.     Defendant Diane Von Furstenberg ("Furstenburg") is, and at all times relevant hereto was, a director of IAC.   Because of Furstenberg's position, she knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.   During the Relevant Period, Furstenberg participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.   Defendant Furstenburg is a citizen of Connecticut.

33.     Defendant Steven Rattner ("Rattner") is a director of IAC and has been since April 2004.  Because of Rattner's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.   During the Relevant Period, Rattner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Ratner is a citizen of New York.

34.     Defendant Anne M. Busquet ("Busquet") was a director of IAC at all times relevant hereto until May 2003.  Because of Busquet's position, she knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.   During the Relevant Period, Busquet

participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Busquet is a citizen of New York.

35.    Defendant Robert R. Bennett ("Bennett") was a director of IAC at all times relevant hereto until September 2004.  Because of Bennett's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bennett participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Bennett is a citizen of Colorado.

36.    Defendant John C. Malone ("Malone") was a director of IAC at all times relevant hereto until September 2004.  Because of Malone's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Malone participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Malone is a citizen of Colorado.

37.    Defendant Jean-Renee Fourtou ("Fourtou") was a director of IAC at all times relevant hereto until June 2003.  Because of Fourtou's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Fourtou participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Fourtou is a citizen New York.

38.     The defendants identified in ¶¶22-23, 26-37 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶22, 24-25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶22, 24-26 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers, directors and/or fiduciaries of IAC and because of their ability to control the business and corporate affairs of IAC, the Individual Defendants owed IAC and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage IAC in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of IAC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

40.     Each director and officer of the Company owes to IAC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of IAC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with IAC, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of IAC.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of IAC, and was at all times acting within the course and

scope of such agency.

43.     To discharge their duties, the officers and directors of IAC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of IAC were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how IAC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of IAC, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of IAC's Board during the Relevant Period.

45.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, IAC has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending IAC and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

46.    Moreover, these actions have irreparably damaged IAC's corporate image and goodwill. For at least the foreseeable future, IAC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that IAC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further

aided and abetted and/or assisted each other in breach of their respective duties.

48. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial prospects, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at IAC and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of IAC, regarding the Individual Defendants' management of IAC's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

49. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least March 2003 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that IAC was misrepresenting its financial prospects. In addition, defendants also made other specific, false statements about IAC's financial performance and future business prospects, as alleged herein.

50. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of IAC common stock so they could: (i) dispose of over $34.9 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; (iii) use the artificially inflated Company stock to acquire companies in stock for stock transactions; and (iv) register 4.4 million shares of the Company's common stock for sale by certain insiders in a secondary offering.

51. The Individual Defendants accomplished their conspiracy, common enterprise and/or

common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial prospects.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

52.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

53.    Throughout the Relevant Period, while IAC's stock price was driven up on the Individual Defendants' positive statements, reaching a Relevant Period high of over $42 per share on July 7, 2003, certain Company insiders, including each of the Individual Defendants, illegally profited on their own personal sales of the Company's common stock, selling over 946 thousand shares of their own IAC stock at inflated prices for over $34.9 million in proceeds and registering 4.4 million shares of the Company's common stock for sale by certain insiders in a secondary offering.  The Company's stock declined to below $22 per share on news of the Company's dismal Q2:04 performance, analyst downgrades, and news of InterContinental's decision, erasing billions of dollars in market capitalization.

## IMPROPER STATEMENTS

54.    On March 19, 2003, the Individual Defendants caused the Company to issue a press release along with Expedia entitled "USA InterActive and Expedia Announce Merger Agreement; USA to Acquire the Expedia Shares It Does Not Already Own in a $3.3 Billion Transaction; USA Announces Board Authorization of Stock Repurchase Plan."  The press release stated in relevant part:

> USA InterActive and Expedia, Inc. announced today that they have entered into an agreement by which USA, already the majority owner of Expedia, would acquire the Expedia shares it does not currently own in a stock for stock transaction that is

generally tax free to Expedia shareholders.  The transaction is valued at $3.3 billion, based on the closing price of USA common stock on March 18, 2003.   The transaction allows USA to further simplify its corporate structure.  The Expedia Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Expedia Board.

Under the agreement, Expedia shareholders would receive 1.93875 shares of USA common stock for each share of Expedia stock that they own, which represents approximately a 30% premium, based on the closing price of USA stock and Expedia stock on March 18, 2003.  In the transaction, USA would issue to Expedia public shareholders approximately 92.5 million basic shares and 124.9 million shares on a fully diluted, treasury method basis.  In connection with the merger, Expedia warrants and options will be converted into warrants and options to acquire USA common stock.  The transaction is expected to be slightly dilutive to USA's adjusted earnings per share ("EPS") for 2003, however, due to expected over performance by Expedia and USA's other businesses, USA believes that it will meet its current 2003 budgeted adjusted EPS of $0.75 per share.  In addition, USA expects Q1 2003 EBITA to very significantly exceed last year's Q1 EBITA and to beat its Q1 2003 EBITA budgeted amount, and expects to meet or exceed its Q1 2003 adjusted EPS budget.  Please note that USA's projections are based on the expectation of a short conflict in Iraq without any other significant geopolitical disruptions during the year.

USA also announced that its Board of Directors has authorized the repurchase of up to 30 million shares of USA common stock.  USA may purchase shares from time to time on the open market or through private transactions, depending on market conditions, share price and other factors.

Barry Diller, Chairman and CEO of USA InterActive, said, "The timing in relation to world events is an accident as often happens with transactions, they take the time they take to reach conclusion however, we were of course mindful of events beyond our own and our decision to acquire the balance of Expedia under these circumstances does dramatically underscore our great belief in the robust growth and long term value of online travel.  Travel may be affected by this or that event, for a day or a month or whatever, but if there is life then there is travel   we bet on the latter."

"We all have so much respect for Rich Barton, Erik Blachford and the superb group they have assembled that has executed so flawlessly building Expedia into a leadership position in online travel   we hope by this consolidation of ownership at USA that this great Expedia group will play an ever expanding role across all our 14 Divisions."

"The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger creates significant value for Expedia's minority shareholders," said Jay Hoag, Chairman of the Special Committee of Expedia's Board of Directors.   "Expedia shareholders have an opportunity to participate in the significant upside potential of USA, which is further enhanced by its full ownership of Expedia."

"This transaction gives us the opportunity to accelerate our work of building a great travel company," said Erik Blachford, incoming President and CEO of Expedia.  "We are looking forward to working with USA and its other entities in a more integrated fashion, and believe there is substantial value to be created in the process."

USA currently owns approximately 54% of the outstanding Expedia stock and controls approximately 94.9% of the combined voting power of the outstanding Expedia shares. USA has agreed to vote all of its Expedia shares in favor of the merger at the Expedia stockholders meeting relating to the merger. USA shareholders holding a majority of the voting power of USA have acted by written consent to approve the transaction. An information statement will be mailed to USA shareholders and a proxy statement/prospectus will be mailed to Expedia shareholders. The transaction, which is subject to customary conditions, is expected to be completed in the summer of 2003. The transaction is not subject to any material adverse effect conditions (including the possible effects of war).

55. On April 10, 2003, the Individual Defendants caused the Company to issue a press release along with Hotels.com entitled "USA InterActive and Hotels.Com Announce Merger Agreement; USA To Acquire the Hotels.Com Shares It Does Not Already Own in a $1.1 Billion Transaction; Transaction Completes USA Corporate Restructuring." The press release stated in relevant part:

USA InterActive and Hotels.com announced today that they have entered into an agreement by which USA, already the majority owner of Hotels.com, would acquire the Hotels.com shares it does not currently own in a tax free, stock for stock transaction. The transaction is valued at approximately $1.1 billion based on the closing price of USA common stock on April 9, 2003.

The transaction would represent the final step in USA's efforts, begun in June 2002, to simplify its corporate structure by buying in its public subsidiaries. As a result of these transactions, all of USA's interests will be indivisible inside USA's public security.

The transaction would not change the current operating structure of Hotels.com, and USA's intention is for Hotels.com and Expedia to continue to be operated separately. Travel is, however, its own sector and USA would continue to review strategy and over time may decide to make changes.

The Hotels.com transaction is expected to be slightly accretive to USA's budgeted adjusted earnings per share for 2003.

The Hotels.com Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Hotels.com Board. Under the agreement, Hotels.com shareholders will receive 2.4 shares of USA common stock for each share of Hotels.com stock that they own. This represents approximately a 20% premium based on the closing price of USA stock and Hotels.com stock on March 18th, 2003, the day prior to the announcement of USA's merger with Expedia. In the transaction, USA would issue to Hotels.com public shareholders approximately 43.0 million basic shares and 45.2 million shares on a fully diluted, treasury method basis.

Barry Diller, Chairman and CEO of USA InterActive, said, "David Litman and Bob Diener, in classic entrepreneurial fashion, have created a great company. We were lucky enough to know that at an early stage, so we've watched their determination and fierce dedication in building up the enterpriseYand we believe all that will continue because the incentives are all in place and our interests completely aligned

for the future."

"The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger is in the best interests of Hotels.com's minority shareholders," said Elan Blutinger, Chairman of the Special Committee of Hotels.com's Board of Directors. "Hotels.com's shareholders have an opportunity to participate in the continued growth potential of USA, which is further enhanced by its full ownership of Hotels.com."

David Litman, Chairman and CEO of Hotels.com, commented, "Bob Diener and I are thrilled at the opportunity for Hotels.com to participate on a broader scale in the future success of USA InterActive. We are convinced that this merger will enhance the growth prospects for Hotels.com, and we are more determined than ever to achieve our company goals through this exciting combination with USA. Bob and I would like to thank the more than 1,200 employees of Hotels.com that have helped to make this possible and we look forward to an exciting future."

In connection with the merger, Hotels.com options would be converted into options to acquire USA common stock, and Hotels.com warrants would be converted into warrants to acquire, or exercisable for, USA common stock. David Litman, Chairman and CEO, and Bob Diener, President, will continue in their current positions, and the new USA shares they receive in the transaction in respect of their Hotels.com shares that are currently subject to transfer restrictions will be subject to those same transfer restrictions. The transfer restrictions remain in effect until March 2004.

USA currently owns approximately 68% of the outstanding Hotels.com stock and controls approximately 97% of the combined voting power of the outstanding Hotels.com shares. USA, as the holder of a majority of the voting power of Hotels.com has acted by written consent to approve the transaction. An Information Statement will be mailed to Hotels.com shareholders in connection with the transaction. No separate USA shareholder approval is required. The transaction, which is subject to customary conditions, is expected to be completed in the summer of 2003. The transaction is not subject to any material adverse effect conditions (including the possible effects of war).

56.    On May 1, 2003, the Individual Defendants caused the Company to issue a press release entitled "USA InterActive Releases Chairman and CEO Barry Diller's Letter to Shareholders Accompanying USA's 2002 Annual Report." The letter stated in relevant part:

To Our Shareholders

While it's my experience that it never seems so living through it, the last year was a whirlwind...the best way to review the year though isn't on a calendar basis, but instead using the start date of May 7th, since this was the date the contribution of our entertainment assets to Vivendi Universal Entertainment closed. On that date we went from a media, entertainment company with ecommerce interests to an interactive transaction company. From that moment, we were a company transformed ending the material veto rights held by other parties, and eliminating the LLC structure under which we'd operated with such complexity and contradiction for almost all the years of our short life.

Through the recently announced buy ins of the minority interests of Expedia and

Hotels.com, and the previously completed acquisition of the outstanding minority interest in Ticketmaster, we have virtually completed the evolutionary process of simplifying our corporate structure.  Recently, I resigned my position as CEO of Vivendi Universal Entertainment  which clarified with great punctuation where my work would be concentrated.  The cumulative effect of these actions has eliminated any lingering question about whether we're a holding company or an operating company.  Clearly, we're now properly viewed as an operating company and judged against our theoretical peers  namely the Tier One companies in interactivity  eBay, Yahoo, and Amazon.

In this arena of Tier One interactive companies, from a financial standpoint, we compare quite favorably.  We lead in Sales, EBITA, and Free Cash Flow  and we're second only to eBay in Gross Transaction Value.  Market valuations in the internet sector certainly have a short and sharp roller coaster history...our equity securities are certainly not currently, or thank God in historical terms, valued at the high multiples of the other leaders in the sector  but, to us, that's entirely besides [sic] the point.  Our perspective is long term, and our focus is not on multiples but on creating real and lasting value for our shareholders.  We're happy to have our performance speak for itself and have our stock follow, rather than the reverse.

These financial yardsticks are consistent with our goal to be the largest, most profitable interactive commerce company in the world  by pursuing a multi brand strategy.  Even though we have leadership today, we want to expand on that lead and create a company in which the power of our brands allows us to create an "unwalled" garden where our customers can benefit through discounts, membership, dynamic pricing and all methods to link and unite our great total audience of our combined users.

From a structural standpoint, there's only one lingering piece of the puzzle that needs final resolution...our VUE securities.  We've been clear on our intentions...this set of securities is worth the equivalent of cash to us and we intend, over the next 6 12 months, to either indirectly monetize this value (through the issuance of USA securities that mirror the economics of our VUE Preferred Stock) or exchange all our VUE securities into something else of substantially greater value.  Our primary motivation is to turn a relatively "passive" asset on our books into the equivalent of cash, which we can then use either to acquire new businesses, invest in our current ones, or shrink our capitalization.

***As we've said before, we are very committed to transparency and clarity when it comes to financial reporting.  We've changed our format for presenting our quarterly numbers to further emphasize the relevant metrics and other important financial information relating to our operations.***  We will continue to give more and more information, trying in every way we can to do so in a clear and concise manner.  The evolving accounting rules (such as those relating to giving equal prominence to GAAP measures along non GAAP [sic] measures like EBITA and Adjusted EPS) sometimes make this challenging.  ***But this type of challenge only reinforces for us our basic principles  namely, that investors are entitled to see all relevant information and to make their own judgment about which parts of our disclosed information are most important to them.***  Also, we're aware that our focus on providing detailed information and full explanation has spawned quite a number of footnotes in our earnings releases and other public filings  sometimes it may seem like there's more footnotes than text.  This isn't something we're proud of, and over time we'd like to see our footnotes steadily shrink...but, what we won't do is dot one less "i" in the pursuit of full and complete disclosure, providing whatever analysis and commentary we can in having our shareholders understand our company exactly

as we do.

*In our annual reporting and earnings releases, we'll give our views about the way in which we look at our results, the ways in which we operate internally and how to best look at our future prospects.* But, be assured that whatever financial metrics you may find most compelling, we'll continue to try and be ahead of your thought process.  This means that we'll present good news in a balanced way *and we'll fairly disclose any anticipation of material bad news and bad trends very early to the extent that we can identify them.  Openness is a mantra to us  and we're committed to talking to the investing community in a way that's totally consistent with the way in which we discuss our company among ourselves.*  We want investors who take a long term view and are not swayed by short term results  - whichever way they may fall.

And, we want our employee incentives aligned with this philosophy.  One of the most important decisions we made this year was deciding to begin our transition away from issuing stock options to granting restricted stock units.  We believe that stock options encourage aggressive behavior and a get rich quick mentality that unfortunately dominated much of the "bubble" economy.  While this has been an understandable shock to many of our employees as they transition out of the "option way of life," we believe it of paramount importance to perfectly align our employee equity incentives with the interests of our shareholders and we can't think of a better answer than restricted stock units.  An equally important component of our equity plan is to extend the average vesting period of our grants   we believe USA equity is dear and we are only interested in people who want to be with us for the long term.  While anyone can own our stock for a minute or a decade, we're only going to make decisions for the company with a long term view.

Given our start in owning television stations, and my own history in entertainment, we certainly didn't get to where we are by design...what we had was a real curiosity about interactivity and the great good luck to have it just prior to the development of the internet.  We proceeded step by step, constantly re evaluating our position, delving into the areas we found interesting, and jumping on opportunities with total focus, speed and aggression.  After seven short years, we are firmly convinced that our distinct approach to this interactive world   that of multiple brands as opposed to one totalitarian brand  is a great way to create value.

While we are certain that the business arena we inhabit is at its earliest stage of development, and that there will be lots of twists and turns along the way, we are committed to making decisions with an absolute view of the value over the long term for our shareholders, and with a highly critical view of our own weaknesses and vulnerabilities.  Our great challenge is to continue to execute in our multiple lines of businesses.  We are mindful every day of the consistent operating discipline necessary to achieve the goals we have set...however, with our stable of brands, each with such great growth ahead and their enormous potential to integrate and create new products and services, we believe we can sustain a competitive advantage far into the future.

All my experience in the entertainment business taught me very few people made the decisions that really counted, that were the determinants of success and failure...every single experience I have had in this new world of interactivity tells me exactly the opposite...it is the expertise and the enterprise of a great many talented people working at every level of the organization that makes for success...we are so very lucky to have so very many engaged in what I deeply believe can be one of this century's great enterprises.  I am at the earliest stage (though I hope growing quickly)

in learning how to manage an organization such as this...part of that is knowing just how much I need to thank its members, together with our wise and engaged Board of Directors for their work this year past, and for their vigorous and challenging support in the work ahead.

Sincerely,
/s/Barry Diller
Barry Diller
Chairman and Chief Executive Officer

57.    On May 1, 2003, the Individual Defendants caused the Company to issue a press release entitled "USA Reports Excellent First Quarter," which stated in relevant part that the Company's adjusted EPS had grown 155% to $0.16 (with GAAP EPS of $(0.23)), that its EBITA had grown 120% to $173 million, that its operating income had grown 236% to $93 million and that its free cash flow and net cash provided by operating activities exceeded $400 million.

58.    On May 5, 2003, the Individual Defendants caused the Company to issue a press release along with LendingTree  entitled "USA InterActive and LendingTree Announce Merger Agreement; Entry into the Financial Services and Real Estate Verticals Gives USA Access to 75% of Total InterActive Commerce (U.S.)."  The press release stated in relevant part:

USA InterActive and LendingTree, Inc. announced today that they have entered into an agreement by which USA would acquire all of the outstanding capital stock of LendingTree in a stock for stock transaction.

The transaction would represent USA's entry into the large and attractive financial services and real estate verticals, both of which are at an early stage of online migration.  LendingTree is the leading lending exchange with more than 200 participant lenders; the Company has facilitated nearly $48 billion in closed loans since inception and has recently entered the real estate sector with excellent early results.

With this transaction, USA now has a presence in seven key areas of interactive commerce that represent approximately 75% of total interactive commerce (U.S.) Travel, Ticketing, Goods, Personals, Local/Classified Advertising, Financial Services and Real Estate.  The acquisition of LendingTree adds another powerful brand and profitable interactive business to the USA family, and furthers USA's goal of being the largest, most profitable interactive commerce company in the world. LendingTree will have access to USA's existing base of nearly 40 million unique monthly Internet users who increasingly are provided opportunities to become customers of more than one USA property through cross promotion, integration and the use of special offers or discounts.

The acquisition of LendingTree will be neutral to USA on an accretion/dilution basis and USA anticipates that LendingTree's long term growth metrics will be consistent with those of USA's fastest growing businesses.

Under the agreement, LendingTree shareholders will receive 0.6199 of a share of

USA common stock for each share of LendingTree common stock that they own, and LendingTree preferred stockholders will receive the same merger consideration, on an as converted basis.  In the transaction, USA would issue to LendingTree shareholders approximately 18.3 million basic shares and 21 million total shares on a fully diluted, treasury method basis.  The transaction is generally expected to be tax free to LendingTree shareholders.  Based on closing prices of USA common stock between April 28, 2003 and May 2, 2003, the transaction is valued in a range of $626 million to $734 million.

Barry Diller, Chairman and CEO of USA InterActive, said, "For several years now we have been saying, in answer to investor and media questions about what's the next area of investment for our Company, that the most exciting sector is in both financial services and real estate   now, with this singular acquisition we enter both, with an excellent Company, having built a fine brand, and with great and deep management strength   we waited appropriately long enough to find the perfect solution   LendingTree."

In connection with the merger, LendingTree options will be converted into options to acquire USA common stock, and LendingTree warrants will be converted into warrants exercisable for USA common stock.

The transaction is subject to LendingTree shareholder approval.  The LendingTree Board of Directors has approved the acquisition by unanimous vote and unanimously recommends that LendingTree shareholders vote to approve the merger agreement and related matters at the special meeting to be called for consideration of the transaction.  USA has received binding voting agreements to support the transaction from LendingTree shareholders representing approximately 31.5% of the as converted to common vote.  The transaction has been approved by the Board of Directors of USA and no separate USA shareholder approval is required.  The merger, which is subject to other customary closing conditions, is expected to be completed in late summer.

Doug Lebda, Founder and CEO, and Tom Reddin, President and COO, will continue in their current positions, as will other key members of the senior management team.  LendingTree's senior management team will have a significant ongoing economic interest in the upside of LendingTree, after USA recovers its acquisition costs with a rate of return, which is designed to incent and retain LendingTree's strong management team over the long term.

Doug Lebda said, "We believe that the merger with USA creates significant value for our shareholders, not only because of the transaction itself but also because of the opportunity to participate in USA's tremendous future as a leader in interactive commerce."

Mr. Lebda continued, "This will create the opportunity for us to accelerate our growth in the consumer lending and real estate verticals, leveraging our scalable business model and leading brand with USA's capital, management expertise and synergies with other USA businesses, particularly those that help penetrate local markets.  Working together we can add significant value to consumers, lenders and REALTORS7, while producing impressive growth and financial returns for shareholders.  On a personal level, I am excited to join the USA family, and for the opportunities this will provide for all of LendingTree's employees and business partners."

59.     On June 23, 2003, the Individual Defendants caused the Company to issue a press

release entitled "InterActiveCorp Completes Acquisition of Hotels.Com," which stated in relevant part that IAC had completed the acquisition of the outstanding shares of Hotels.com that it did not already own. "In the transaction, IAC issued to Hotels.com public shareholders approximately 44.3 million basic shares and 47.2 million shares on a fully diluted, treasury method basis."

60.     On August 5, 2003, the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q2 2003 Results," which stated in relevant part that the Company's Q2:03 revenue was $1.5 billion, up 38%, its GAAP diluted EPS from continuing operations were $0.09, its adjusted EPS was $0.18, and its year to date net cash provided by operating activities was $939 million.

61.     On August 8, 2003, the Individual Defendants caused the Company to issue a press release entitled "IAC Completes Acquisition of Expedia, Inc.," which stated in relevant part that the Company had completed the acquisition of the outstanding shares of Expedia that it did not already own and that IAC had issued to Expedia's public shareholders approximately 100.8 million basic shares of IAC common stock and 133.3 million shares on a fully diluted, treasury method basis.

62.     On August 8, 2003, the Individual Defendants caused the Company to also issue a press release entitled "IAC Completes Acquisition of Lending Tree," stating in relevant part that the Company had completed its acquisition of LendingTree and that, as a result of the acquisition, IAC would issue to LendingTree shareholders approximately 18.8 basic shares and 21.1 shares on a fully diluted, treasury method basis.

63.     On August 10, 2003, *The New York Times* ran a story entitled "Financial Disclosure, the Barry Diller Way," which stated in relevant part:

> WHEN the titans of media and finance met last month in Sun Valley, Idaho, for the annual conference held by the investment banker Herbert Allen, the chatter was not limited to wheeling and dealing.  Corporate governance was also a topic of discussion.  Three company chairmen  Warren E. Buffett of Berkshire Hathaway, Howard Stringer of Sony and Barry Diller of InterActiveCorp.  even participated in a panel on the subject for the lustrous crowd.
>
> To some investors, Mr. Diller's inclusion on such a panel may seem incongruous. For while many companies have spent the past year making their financial reports simpler and more transparent, those from InterActive, an Internet commerce conglomerate whose businesses include the Home Shopping Network, Expedia Inc. and Hotels.com, are still maddeningly complex.

Investors perusing the company's quarterly earnings release from last Tuesday, for example, encountered a thicket of pro forma figures, used by InterActive to put the best spin on its results. Of course, the company also presented results according to generally accepted accounting principles, as regulators require. But pro forma figures   which calculate results excluding certain items   dominated the release.

Perhaps more troubling, profits at InterActive's two big Internet travel sites, Expedia and Hotels.com, the company's growth engines, may be inflated. The problem is that the sites may be paying less in hotel occupancy taxes than government authorities think is owed. And a disclosure in a recent regulatory filing, saying that the company could be forced to pay back taxes to state or local authorities and pay more taxes in the future, was minimal at best.

Moreover, nowhere in its documents does InterActive tell investors how much its earnings could be hurt if tax authorities require it to alter its practices.

In a telephone interview last Wednesday, Mr. Diller bristled at the notion that his company's financial statements were purposefully complex. "I would say strongly that we go to extraordinary lengths to be transparent and to write it in plain English," he said.

"Our goal is to simplify the capital structure of the company," he said. "We've made acquisitions, we have pro forma issues, issues of amortization, and our shareholders want to look at the company in ways other than GAAP, and we provide supplemental information that we hope is clear. By doing what we did this quarter, which was to essentially not obfuscate anything, was, I think, a fine step."

Dara Khosrowshahi, InterActive's chief financial officer, rejected the contention that the company's stance on the hotel occupancy tax was aggressive. "This tax issue is not a big deal in general," he said.  "We have been advised on these issues by multiple experts in the area. They have advised us that we have a completely sound position as far as taxes go."

With InterActive, Mr. Diller intends to build the world's largest and most profitable e commerce company.  To that end, he has been dumping broadcasting and entertainment assets and replacing them with Internet commerce concerns.

In the past 12 months, InterActive has paid almost $8 billion to acquire Hotels.com; Ticketmaster; uDate.com, an Internet dating service; Entertainment Publications Inc.; Expedia; and the Interval Acquisition Corporation, a real estate services company; and LendingTree Inc., an online financial services concern. Most of the acquisitions were made using InterActive's highflying stock.

InterActive's second quarter results showed the success of the strategy. Revenue rose 38 percent, while operating income jumped to $112 million from $25.4 million in the corresponding period last year. The biggest contributor to the growth was InterActive's online travel business, especially the bookings at Expedia, which sells airline tickets and hotel rooms on the Web. Revenue in the travel services unit, which includes Expedia and Hotels.com, grew 72 percent, and operating income doubled, to $88.7 million.

Like most Internet stocks, InterActive's shares have been incendiary, rising as high as $42.74 last month, up 86 percent for the year. But management's disclosure last week that net income for the rest of the year would be lower than forecast helped push down the stock to $34.71 at Friday's close. That gives InterActive a market

value of $1.94 billion and a price to earnings ratio of 41  and reduces its stock gain this year to 51 percent.

STILL, profits at InterActive's online travel units, as good as they look now, may be more vulnerable than some investors appreciate.  If the company soon has to pay more in hotel occupancy taxes, its profits would be cut substantially.

InterActive's hotel booking subsidiaries, Hotels.com and Expedia, interact with their customers in one of two ways.  They can act as agents, letting a customer reserve a room using a credit card, which the traveler uses to pay the hotel bill at checkout.  In these circumstances, an Internet customer is typically advised that taxes may or may not be included in the total cost listed on the site.

But the sites make far more money in their capacity as merchants, buying blocks of rooms at wholesale prices from a hotel and selling them to consumers at higher prices.  When Expedia acts as a merchant, the rooms often carry an "Expedia special rate" and appear atop a list of available rooms for a given destination.  It is here that the taxes paid by InterActive can come into question.

In its financial filings, InterActive acknowledges that it remits taxes to government authorities based on the wholesale cost of the rooms that it buys and resells, not on the amount it charges to consumers who book rooms on its sites.  The company does not make this disclosure to consumers shopping on its Web sites.

InterActive often charges its customers what it identifies as "taxes and fees" for several popular travel destinations.  To a traveler accustomed to paying steep hotel occupancy taxes, the amount may look mainly like a tax, with a small fee added.  But because the tax paid by the company is based on the wholesale, not the retail, room rate, the fee portion is much larger than it might seem.  On each transaction, the companies appear to pocket as profit an amount that some taxing authorities may end up contending is theirs.

Because Hotels.com and Expedia lump together what they charge in taxes and fees, consumers do not know how much they are paying for each.  Expedia's airline booking system, by contrast, clearly differentiates what its customers pay in taxes and what they pay in booking fees.  Mr. Khosrowshahi said the company did not break out taxes and fees on hotel rooms because doing so would alert other online booking services to deals that Hotels.com or Expedia have made with lodging chains.

Occupancy taxes vary across the country.  New York City, the top destination for Hotels.com customers, charges state and city hotel occupancy taxes of 13.625 percent  an 8.625 percent state tax and a 5 percent city tax  and a state fee of $2 a room.

A check of New York City room prices on Hotels.com and Expedia indicates that taxes and fees charged by the sites can total 18 percent of the room rate.  On Expedia, a room for two at the Milford Plaza in Midtown Manhattan later this month cost $109 a night, plus taxes and service fees of $19.04, or 17.5 percent.  On Hotels.com, a room for two at that hotel on the same night cost $91.75, plus $16.75, or 18.3 percent, in taxes and service fees.

Neither Expedia nor Hotels.com discloses the amount paid to the operator of the Milford Plaza for the room.  But assuming that its markup is 25 percent, which is standard in the industry, that would put Expedia's wholesale price for the room at about $87 and Hotels.com's at about $81.

Taxes due to New York State and New York City on those rates would be $13.85 at Expedia and $13.03 at Hotels.com. So by charging $19.04 in taxes and service fees, Expedia's profits could be $5.19 on the room, or 6 percent of its cost. By charging $16.75 in taxes and fees, Hotels.com's profits could be $3.72, or 5 percent of the room's cost.

If Expedia and Hotels.com paid taxes to the city and state based on what they charge customers, their profits would be much lower. The $19.04 that Expedia charges for taxes and fees would generate a profit of only $2.19, or 2.5 percent of the room's wholesale cost. The $16.75 in taxes and fees charged by Hotels.com would produce profits of $2.25, or 2.4 percent of the room's cost.

WHEN asked about the taxpaying practices of Internet hotel sites, Tom Bergin, spokesman for New York's taxation and finance department, said: "Our audit and enforcement divisions are currently moving to address these and other sales tax issues."

Orlando, Fla., in Orange County, is another big destination for customers of Hotels.com and Expedia. Martha Haynie, comptroller of Orange County, which charges a resort tax of 5 percent on its hotel rooms, said: "It is our position that the tax is due on the gross room rate because it appears they are charging the customer tax on that room rate, and if they are collecting tax and not remitting it we are going to want that."

These receipts are attractive, Ms. Haynie said, because tax collections for the first five months of this year are down from last year. "I'm beginning to wonder how much impact this dot com business may be having" on the decline, she said.

Dave Bruns, spokesman for Florida's revenue department, said it expected to advise companies later this month whether they must remit the 6.5 percent sales tax on the amount they charge customers for a room.

Texas law already states that a company that buys a block of rooms, marks them up, sells them over the Internet and has its own cancellation policy must collect and remit hotel taxes on the amount a customer pays.

Texas state occupancy taxes are 6 percent; Dallas levies an added city hotel tax of 9 percent. A recent search on Expedia and Hotels.com for a room at the Holiday Inn Aristocrat in Dallas for later this month indicated taxes and fees of 17 percent to 18 percent of the room rate.

Mr. Khosrowshahi dismissed the threat that tax authorities might present to the company's earnings. He said InterActive's practices were standard in the online travel industry.

But InterActive notes in its government filings that it may be vulnerable to additional or back taxes. "A successful assertion by one or more states or local taxing jurisdictions that we should collect sales or occupancy taxes on the sale of hotel rooms could result in substantial tax liabilities for past sales, decrease our ability to compete with other Internet travel companies not subjected to collecting sales and occupancy taxes and otherwise harm our business," a recent regulatory filing stated.

How much could InterActive's earnings be hurt if state authorities forced it to pay additional taxes?

Mr. Khosrowshahi said: "We don't think it is a significant liability at all.  We are in discussions with a number of states' tax authorities, and the discussions have been productive and encouraging."  He said the company had set aside a reserve of less than $10 million to cover potential tax bills.

But financial filings and news releases from Expedia and Hotels.com before they were absorbed into InterActive allow for a rough estimate of how the company's earnings could decline if tax authorities disagreed with Mr. Khosrowshahi's assessment.  Based on that information, the shortfall could be substantial.

From the start of 2001 until the end of March 2003, Hotels.com and Expedia reported how many rooms they had sold each quarter as merchants rather than as agents.  By analyzing the companies' cost of goods sold, one can estimate what the companies pay to hotel companies for rooms they buy and, therefore, what they remit in taxes.

For example, in the first quarter of 2003, the average cost per room paid by Hotels.com was around $84, including taxes.  Assuming an occupancy tax of 13 percent  a rough hybrid of taxes in the companies' major hotel markets  Hotels.com would have paid $11 in taxes per room.

According to the company, customers pay $120, on average, for a room.  At a tax rate of 13 percent, that would mean a tax of a little more than $16 per room night.  Because Hotels.com paid $11 in taxes on the room per night and received taxes and fees of $16, that would translate into a profit of around $5.

In the quarter, Hotels.com recorded 2.3 million room nights, generating operating profit of $27.2 million.  If local tax officials had taken the $5 a room night difference, operating earnings would have fallen by $11.5 million, or 42 percent of the amount the company recorded.

At Expedia during the same quarter, the company booked 2.8 million merchant hotel room nights and showed income from operations of $42 million.  At around $4 per room, the difference between what Expedia pays in taxes and what it receives could have been $11.3 million, or 27 percent of operating profits.

Applying these figures to InterActive's operating profit indicates that in the first quarter, the tax profit per room night at Hotels.com and Expedia could have accounted for 24 percent of InterActive's operating profit.

Of course, these figures are rough estimates, and the actual numbers could be less or more.

Mr. Khosrowshahi declined to comment on the estimates, saying that it was wrong to assume that additional taxes would be collected at all and that any attempt to quantify the potential hit to earnings was invalid.

Consumers are starting to notice the tax issue.  A lawsuit filed in a state district court in Duval County, Tex., last June by Nora J. Olvera contends that Hotels.com charged excess taxes on hotel accommodations "that were not owed or remitted to taxing authorities and that in equity and good conscience belong to plaintiff."

Deborah Roth, a spokeswoman for InterActive, said the company does not comment on pending litigation.

Even if state tax authorities choose not to pursue InterActive for past or future taxes, consumers may not appreciate paying an amount that they believe covers a tax but that instead is profit for InterActive.

64.    In response to *The New York Times* piece, on August 11, 2003, the Individual Defendants caused the Company to issue a press release entitled "Letter From IAC/InterActiveCorp to *The New York Times*," which quoted a letter from Diller stating in relevant part:

– – We object to the entire premise of the articles to the extent they question the sufficiency of IAC/InterActiveCorp's public disclosures.  IAC has been a leader on disclosure.  We publicly release our budget.  We were one of the first companies to stop providing quarterly "guidance."  We are a prolific filer of information under Regulation FD to ensure that our shareholders have all up to date information that is important and relevant to them.  Not many companies include their Principles of Financial Reporting so that investors can see with precision a detailed explanation for each of our actions.  It is irresponsible to present a one sided, ill informed article that does not at a minimum note the company's consistent policy of open disclosure.  We are also mystified by the characterization of our use of pro formas as "spin."  As reflected in our various public documents, we use pro formas only to clarify and to add information   and we have done so even when their use makes our results look less favorable.

– – "The main article states that some government authorities are considering whether Hotels.com and Expedia are required to collect and remit room occupancy taxes on the amount of the customers' payment that is retained by Hotels.com and Expedia.  Unfortunately, the article then recklessly jumps to the conclusion that if such occupancy taxes were found to be owed on all of the companies' revenue, from all jurisdictions, the companies' liability could be substantial.  But while a limited number of jurisdictions have raised this issue (and the companies are engaged in ongoing dialogue with those jurisdictions), there is simply no basis for the supposition that the companies will face liability in all jurisdictions.  The applicable tax provisions vary among the jurisdictions, and many of the jurisdictions, including certain high revenue states, limit the obligation to collect occupancy taxes to businesses that are hotel "operators" (or similar language), a category that we do not believe includes Expedia and Hotels.com.  While statutes in some jurisdictions do not specifically limit occupancy tax collection responsibilities to hotel operators, the companies believe they have sound additional arguments as to why they are not required to collect and remit occupancy taxes in those jurisdictions (the companies do not presently collect or remit taxes on the portion of the customer payment that they retain).  We are engaged in what we believe are productive discussions with the tax authorities in various jurisdictions to resolve this issue.  The company has disclosed this issue in its prior public filings and has taken appropriate reserves (less than $10 million) in accordance with applicable accounting rules.

65.    On November 5, 2003, the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q3 2003 Results," which stated in relevant part that the Company's Q3 2003 revenue was $1.6 billion, up 36%, its GAAP net income was $19 million or $0.02 per diluted share, its Adjusted Net Income was $130 million or $0.17 per share, up 136%, and its year-to-date net cash provided by operating activities was $1.1 billion, up from $624 million.

The press release also disclosed that the Company had repurchased 20 million shares of IAC common stock during the quarter for $717 million and announced a new 50 million share repurchase authorization.

66.    On November 11, 2003, the Individual Defendants caused the Company to conduct an "Investor Day" conference and stated that they expected 30% growth in long-term sales.

67.    On February 9, 2004, the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q4 2003 Results," which stated in relevant part that the Company had reported that Q4 2003 revenue had grown, "36% over the prior year to $1.8 billion and operating income had grown 142% to $179 million."  The release stated that, "GAAP net income was $153 million versus $145 million in the prior year and GAAP EPS was $0.20 versus $0.30 in the prior year," attributing to the decrease in GAAP EPS largely due to higher amortization of intangibles, non-cash compensation and higher shares outstanding in Q4 2003.  "For the full year 2003, GAAP EPS was $0.23 versus $4.54 in the prior year."  Q4 2003 Operating Income Before Amortization ("OIBA") had grown 131% to $292 million.  "Adjusted Net Income was $228 million versus $169 million in the prior year and adjusted EPS was $0.29 versus $0.24 in the prior year.  For the full year 2003, adjusted EPS was $0.81 versus $0.33 in the prior year."  The release stated that the Travel segment, "increased revenues by 41% to $677 million, operating income by 119% to $108 million and OIBA by 111% to $150 million, driven by growth in its merchant hotel, packages and international businesses."  Finally, the release disclosed that during the Q4 2003 quarter, IAC repurchased 19 million shares for total consideration of $591 million.

68.    On May 3, 2004,  the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q1 2004 Results," which stated in relevant part that the Company's revenue had grown to $1.5 billion, "up 23% over the prior year on a comparable net basis and up 6% as reported," that its operating income decreased 57% "as a result of non cash compensation and amortization of intangibles recorded primarily as a result of the buy ins of IAC's formerly public subsidiaries, as well as higher selling and marketing expenses," that GAAP net income was $38 million versus a loss of $110 million in the prior year and GAAP diluted EPS was $0.05 versus ($0.23) in the prior year.  The release also stated that the Travel segment "increased revenues on a

comparable net basis by 41% to $494 million, operating income by 21% to $85 million and

Operating Income Before Amortization by 23% to $128 million, driven by growth in its merchant

hotel, packages and international businesses."

69.     On August 3, 2004, the Individual Defendants caused the Company to issue a press

release entitled "IAC Reports Q2 2004 Results," which stated in relevant part:

> IAC/InterActiveCorp reported Q2:04 results today.  Revenue was $1.5
> billion, operating income decreased 1% to $110 million, net income decreased 25%
> to $70 million, and GAAP Diluted EPS decreased to $0.09 from $0.16.  2004 GAAP
> results were impacted by increased amortization of non cash expenses and increased
> shares outstanding related to the buy ins of [InterActive]'s formerly public
> subsidiaries.

> Operating Income Before Amortization grew by 23% to $250 million.
> Adjusted Net Income grew 24% to $174 million and Adjusted EPS was $0.22 versus
> $0.18 in the prior year....

> IAC Travel ("IACT") increased revenue on a comparable net basis by 34%
> to $556 million, operating income by 46% to $129 million and Operating Income
> Before Amortization by 29% to $171 million .... HSN U.S. grew revenue, operating
> income and Operating Income Before Amortization by 8%, 2% and 4%, respectively.
> Ticketing grew revenue, operating income and Operating Income Before
> Amortization by 4%, 43% and 29%, respectively, despite relative weakness in
> industry wide concert sales.

*IAC repurchased 8.1 million shares during Q2.*

### REASONS THE STATEMENTS WERE IMPROPER

70.     The Individual Defendants' statements made in connection with the announcement

of these acquisitions and with the Company's financial reports and other statements made throughout

the Relevant Period were materially false and misleading because they did not disclose that:

(a)     Certain of the Company's online customers were being double-billed for hotel

rooms purchased on the Company's Web sites because the Company was not timely and/or

accurately reporting hotel room sales to the chain hotels and as a result, certain customers were

again being charged the room rates that the Company had already collected, leading to great

customer dissatisfaction;

(b)     Certain hotel chains were contesting the Company's slow payment for hotel

room sales made on its Web site and were threatening to make less hotel rooms available to the

Company and/or to stop doing business with the Company altogether;

(c)      Certain of the Company's Web site customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount, the Company was charging a premium for rooms, leading to further customer dissatisfaction and causing customers to choose other online reservation providers or to buy directly from the hotel Web sites;

(d)      Certain IAC hotel customers were dissatisfied with the Company's practice of displaying a message on its Web sites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out, which had the effect of diverting potential sales to other hotels, causing certain hotel customers to threaten to stop doing business with the Company altogether;

(e)      The Company had previously been selling a large number of hotel rooms and airline seats through more than 24,000 affiliate Web sites, such as Web sites operated by the travel industry in certain cities, but since October 2002, many of these Web sites were either privately threatening and/or actually pursuing litigation against the Company, alleging among other things copyright infringement and predatory advertising, claiming that Hotels.com was using special software to deprive these affiliate Web sites of the portion of its fee that it had promised to pay them and that as a result, certain of the affiliate Web sites had refuted their otherwise exclusive, multi-year contracts with the Company and certain of these affiliate Web sites were instead transacting their purchases of hotel rooms directly with the hotel chains;

(f)      One substantial business partner of Hotels.com, Metroguide, had commenced a lawsuit against Hotels.com and Diener alleging violations of federal copyright law and unfair business practices in January 2003 in the Southern District of Florida.  The Individual Defendants did not disclose the pendency of this litigation or the rift with what Diener had described in October 2002 as one of Hotels.com's "larger affiliates, proving [Hotels.com] a great deal of traffic";

(g)      The Individual Defendants were causing the Company to under-report its state and local sales tax expenses for some locations because the Individual Defendants were causing the Company to pay state and local occupancy taxes based on the wholesale rate at which the Company rented blocks of rooms from hotel operators, rather than the higher retail rates charged customers; and

(h)    Certain hotels and airlines were decreasing the Company's allotment of rooms and seats because of the Individual Defendant's bad business practices.

71.    As a result of the Individual Defendants' actions, IAC's market capitalization has been damaged by over $14.8 billion.  At the same time that the defendants were causing IAC to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $34.9 million of their personally held stock.

## ILLEGAL INSIDER SELLING

72.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of IAC stock:

| Name | Date | Shares | Price | | Proceeds | |
|------|------|--------|-------|---|----------|---|
| Barry Diller | 6/3/2003 | 775,000 | $ | 37.00 | $ | 28,675,000.00 |
| | | **775,000** | | | **$** | **28,675,000.00** |
| Dara Khosrowshahi | 5/29/2003 | 2,600 | $ | 36.96 | $ | 96,096.00 |
| | 5/29/2003 | 300 | $ | 36.97 | $ | 11,091.00 |
| | 5/29/2003 | 2,100 | $ | 37.00 | $ | 77,700.00 |
| | 5/29/2003 | 5,000 | $ | 37.02 | $ | 185,100.00 |
| | 5/29/2003 | 10,000 | $ | 37.08 | $ | 370,800.00 |
| | 5/29/2003 | 5,000 | $ | 37.15 | $ | 185,750.00 |
| | 5/29/2003 | 4,600 | $ | 37.56 | $ | 172,776.00 |
| | 5/29/2003 | 4,000 | $ | 37.57 | $ | 150,280.00 |
| | 5/29/2003 | 800 | $ | 37.58 | $ | 30,064.00 |
| | 5/29/2003 | 200 | $ | 37.59 | $ | 7,518.00 |
| | 5/29/2003 | 14,400 | $ | 37.60 | $ | 541,440.00 |
| | 5/29/2003 | 1,000 | $ | 37.66 | $ | 37,660.00 |
| | | **50,000** | | | **$** | **1,866,275.00** |
| Julius Genaschowski | 5/30/2003 | 21,666 | $ | 37.50 | $ | 812,475.00 |
| | 5/29/2003 | 10,000 | $ | 37.80 | $ | 378,000.00 |
| | 5/29/2003 | 10,000 | $ | 37.75 | $ | 377,500.00 |
| | 5/16/2003 | 20,000 | $ | 36.00 | $ | 720,000.00 |
| | 5/15/2003 | 20,000 | $ | 35.55 | $ | 711,000.00 |
| | | **81,666** | | | **$** | **2,998,975.00** |
| Richard N. Barton | 9/11/2003 | 20,000 | $ | 33.97 | $ | 679,400.00 |
| | 8/21/2003 | 20,000 | $ | 37.42 | $ | 748,400.00 |
| | | **40,000** | | | **$** | **1,427,800.00** |
| | **TOTAL** | **946,666** | | | **$** | **34,968,050.00** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.    Plaintiff brings this action derivatively in the right and for the benefit of IAC to

redress injuries suffered, and to be suffered, by IAC as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  IAC is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

74.    Plaintiff will adequately and fairly represent the interests of IAC in enforcing and prosecuting its rights.

75.    Plaintiff is and was an owner of the stock of IAC during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

76.    The current Board of IAC consists of the following ten individuals: defendants Barton, Bronfman, Diller, Kaufman, Keough, Kravis, Rattner, Schwarzkopf, Spoon and Furstenberg.  Plaintiff has not made any demand on the present Board of IAC to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non public information described herein.  While in possession of this material adverse non public information regarding the Company, the following current members of the IAC Board participated in the illegal insider selling:

(i)    During the Relevant Period, Diller sold 775,000 shares of IAC stock for proceeds of $28,675,000; and

(ii)    During the Relevant Period, Barton sold 40,000 shares of IAC stock for proceeds of $1,427,800.  Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested and any demand upon them is futile;

(b)    The Compensation/Benefits Committee of the Board is authorized to exercise

all of the powers of the Board with respect to matters pertaining to compensation and benefits, including but not limited to, salary matters, incentive/bonus plans, stock compensation plans, investment programs and insurance plans.  The Compensation Committee is comprised of defendants Keough, Schwarzkopf and Spoon.  As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Keough, Schwarzkopf and Spoon.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants Barton, Bronfman, Diller, Kaufman, Kravis, Rattner and Furstenberg is futile;

(c)    The principal professional occupation of defendant Diller is his employment with IAC, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:03 IAC paid defendant Diller $5,163,232, in salary, bonus and other compensation.  Accordingly, defendant Diller lacks independence from defendants Keough, Schwarzkopf and Spoon, defendants who are not disinterested and/or independent and who exert influence over defendant Diller's compensation by virtue of their positions as members of the Compensation/Benefits Committee and the Performance-Based Compensation Committee.  This lack of independence renders defendant Diller incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)    The principal professional occupation of defendant Kaufman is his employment with IAC, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:03 IAC paid defendant Kaufman $3,656,000 in salary, bonus and other compensation, and granted him restricted stock awards worth approximately $2,777,913.  Accordingly, defendant Kaufman lacks independence from defendants Keough, Schwarzkopf and Spoon, defendants who are not disinterested and/or independent and who exert influence over defendant Kaufman's compensation by virtue of their positions as members of the Compensation/Benefits Committee and the Performance-Based Compensation Committee.  This lack of independence renders defendant Kaufman incapable of impartially considering a demand to commence and vigorously prosecute this action;

(e)    According to IAC's Proxy Statement filed with the SEC on or about April 29,

2004, defendants Keough, Schwarzkopf and Spoon were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible for: (i) discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies; (ii) discussing with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies; and (iii) review disclosures made to Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein involving management or other employees who have a significant role in the Company's internal controls. Nonetheless, the Audit Committee recommended that the Board disseminate the improper financial statements and press releases described herein. By such actions, defendants Keough, Schwarzkopf and Spoon breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(f)    The entire IAC Board and senior management participated in the wrongs complained of herein. IAC's directors are not disinterested or independent due to the following: defendants Barton, Bronfman, Diller, Kaufman, Keough, Kravis, Rattner, Schwarzkopf, Spoon and Furstenberg served on the IAC Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to IAC and its shareholders in that they failed to prevent and correct the improper financials statements and press releases. Thus, the IAC Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected IAC to millions of dollars in liability for possible violations of applicable securities laws;

(g)      Defendant Diller owns 239,018,906 shares representing 60.8% of the voting rights of IAC.  Diller's substantial holdings allows him to control and dominate the Board. Defendants Barton, Bronfman, Kaufman, Keough, Kravis, Rattner, Schwarzkopf, Spoon and Furstenberg are beholden to Diller because of his ability to influence their decisions.  Thus any demand on defendants Barton, Bronfman, Kaufman, Keough, Kravis, Rattner, Schwarzkopf, Spoon and Furstenberg would be futile;

(h)      Defendants signed numerous documents filed with the SEC that omitted material facts with respect to the Company's business prospects as described herein.  Among those documents were the proxies IAC filed during the Relevant period, dated April 30, 2003 and April 29, 2004.  The failure to disclose these material facts in those filings enabled the defendants to win reelection in those proxies. Because those elections were based on proxy statements that mislead investors about the Company's business prospects, plaintiff seeks to void those elections.  Because defendants may not have gotten elected absent the misleading proxy statements and because plaintiff seeks to void those elections due to the misleading proxy statements, defendants are inherently interested, and demand upon them is futile;

(i)      The Individual Defendants, because of their inter related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein supra, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)      ***Diller and Furstenberg Have a Long-Time Personal Relationship:***

After twenty-six years of friendship, defendants Diller and Furstenberg were married in February 2001.  Because of their long-standing personal relationship, neither defendant Diller nor defendant Furstenberg will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(ii)     ***Diller, Kravis, Fourtou and Bronfman Are Long-Time Business Associates:***

Defendant Diller, was CEO of Vivendi Universal ("Vivendi") until March 19, 2003. Defendant Kravis is a director of Vivendi, and has been since April 2001.  Defendant

Fourtou is Chairman and CEO of Vivendi, and has been since July 2002. Defendant Bronfman was Executive Vice Chairman of Vivendi from December 2000 to March 2002 and a director of Vivendi from December 2000 to December 2003. Because of their long-standing and entangling business and professional relationships, defendants Diller, Kravis and Bronfman will not take the action requested by plaintiff herein against defendant Fourtou, one another or the remainder of the Individual Defendants.

### (iii)    *Bennet and Malone Are Long-Time Business Associates:*

Defendant Bennett is the President/CEO of Liberty Media Corporation ("Liberty"), and has been since April 1997. Bennet is also a director of Liberty, and has been since September 1994. Bennet served in various other executive positions since Liberty's inception in 1990. Defendant Malone is the Chairman of Liberty and has been since 1990. Defendant Bennet is a director of UnitedGlobal.com ("United"), and has been since January 2002. Defendant Malone is a director of United and has been since January 2002. Because of their long-standing and entangling business and professional relationships, neither defendant Bennet nor defendant Malone will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

### (iv)    *Keough and Khosrowshahi Are Long-Time Business Associates:*

Defendant Keough is Chairman and a director of Allen & Co. ("Allen"), and has been since April 1993. Defendant Khosrowshahi was Vice President of Allen from 1995 to 1998. Because of their long-standing and entangling business and professional relationships, defendant Keough will not take the action requested by plaintiff herein against defendant Khosrowshahi or the remainder of the Individual Defendants.

### (v)    *Keough and Diller Are Long-Time Business Associates:*

Defendant Keough is a director of The Coca-Cola Company ("Coke"), and has been since 2004. Defendant Diller is a director of Coke and has been since 2002. Because of their long-standing and entangling business and professional relationships, neither defendant Keough nor defendant Diller will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

### (vi)    *Schwarzkopf and Malone Are Long-Time Associates:*

Defendant Schwarzkopf was on the President's Conservation Council and Board of Governors of Nature Conservancy ("Nature") until at least April 2004. Defendant Malone was on the Board of Governors of Nature until at least April 2004. Because of their long-standing and entangling professional relationship, defendant Schwarzkopf will take the action requested by plaintiff herein against defendant Malone or the remainder of the Individual Defendants.

### (vii)    *Diller and Malone are Long-Time Business Associates:*

In December 1993, defendant Rattner worked on Viacom's $10 billion takeover of Paramount. Rattner worked on the deal while Diller was bidding and won Paramount. Prior to bidding for Paramount Diller had been Chairman from 1974 to 1984. John C. Malone had also backed Diller's bid for Paramount through TCI's Liberty Media programming unit before Liberty agreed to sell its 22% stake in QVC.

(j)     Defendant Furstenberg is the founder and Chairman of Diane Von Furstenberg Studio, L.P. ("Studio").  During 2003, one of IAC's businesses, Home Shopping Network, made payments to Studio of approximately $263,000 relating to sales of the Studio's fashion merchandise by Home Shopping Network.  Accordingly, demand that defendant Furstenberg take the action requested by plaintiff is futile because she has an interest in safeguarding the continuing lucrative business relationship between IAC and Studio from which she derives financial benefits by virtue of her positions at Studio and IAC;

(k)     Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein;

(l)     The defendant directors of IAC, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from IAC's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(m)     In order to bring this suit, all of the directors of IAC would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(n)     The acts complained of constitute violations of the fiduciary duties owed by IAC's officers and directors and these acts are incapable of ratification;

(o)     Each of the defendant directors of IAC authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(p)     Any suit by the current directors of IAC to remedy these wrongs would likely expose the Individual Defendants and IAC to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are

hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(q)     IAC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for IAC any part of the damages IAC suffered and will suffer thereby;

(r)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

(s)     If IAC's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of IAC.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by IAC against these defendants, known as, inter alia, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of IAC, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause IAC to sue them, since they will face a large uninsured liability.

77.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for IAC for any of the wrongdoing alleged by plaintiff herein.

78.     Plaintiff has not made any demand on shareholders of IAC to institute this action since such demand would be a futile and useless act for the following reasons:

　　　　a.     IAC is a publicly held company with approximately 696 million shares outstanding, and thousands of shareholders;

　　　　b.     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

　　　　c.     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### (Derivative Claim For Violation of Section 14(a) of the Securities Exchange Act of 1934 Against All Defendants)

79.     Plaintiff incorporates all other paragraphs herein.

80.     The defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders that were contained in Proxy Statements that misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reasons of the conduct alleged herein, each defendant violated §14(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, IAC misled and/or deceived its shareholders by failing to disclose material facts regarding its business prospects.

81.     This information would have been material to IAC's shareholders in determining whether to elect directors to manage their company.

82.     Plaintiff, on behalf of IAC, thereby seeks to void the election of the current Board defendants based upon the misleading and incomplete proxy materials.

## COUNT II

### (Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information)

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

84.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold IAC common stock on the basis of such information.

85.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold IAC common stock.

86.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's prospects were materially overstated.  The Insider Selling Defendants' sales of IAC common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

87.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III

### (Against All Defendants for Breach of Fiduciary Duty)

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     The Individual Defendants owed and owe IAC fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe IAC the highest obligation of good faith, fair dealing, loyalty and due care.

90.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

91.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, IAC has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

93.     Plaintiff on behalf of IAC has no adequate remedy at law.

## COUNT IV

### (Against All Defendants for Abuse of Control)

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence IAC, for which they are legally responsible.

96.     As a direct and proximate result of the Individual Defendants' abuse of control, IAC has sustained significant damages.

97.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

98.     Plaintiff on behalf of IAC has no adequate remedy at law.

## COUNT V

### (Against All Defendants for Gross Mismanagement)

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of IAC in a manner consistent with the operations of a publicly held corporation.

101.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, IAC has sustained significant damages in excess of hundreds of millions of dollars.

102.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

103.    Plaintiff on behalf of IAC has no adequate remedy at law.

## COUNT VI

### (Against All Defendants for Waste of Corporate Assets)

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    As a result of the improper statements, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused IAC to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

106.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

107.    Plaintiff on behalf of IAC has no adequate remedy at law.

## COUNT VII

### (Against All Defendants for Unjust Enrichment)

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of IAC.

110.    Plaintiff, as a shareholder and representative of IAC, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Declaring and decreeing that the Defendants caused the Company to act in violation of §14(a) of the Exchange Act, thereby voiding the elections of the Current Board defendants based upon the misleading and incomplete proxy materials.

B.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of IAC has an effective remedy;

D.      Awarding to IAC restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: November 15, 2004          FARUQI & FARUQI, LLP
                                  NADEEM FARUQI
                                  SHANE T. ROWLEY


                                  /s/ Shane T. Rowley
                                       SHANE T. ROWLEY (SR-0740)

                                  320 East 39th Street
                                  New York, NY  10016
                                  Telephone: 212/983 9330
                                  Facsimile: 212/983 9331

                                  Attorney for Plaintiff